871 P.2d 762

**SIERRA TUCSON, INC., an Arizona corporation, Sierra Tucson/Arizona Holdings, Inc., an Arizona corporation, Sierra Tucson Companies, Inc., a Delaware corporation, and Sierra Tucson Educational Materials, Inc., an Arizona corporation, Plaintiffs–Appellants,**

v.

**PIMA COUNTY, a body politic; the Arizona Department of Revenue, a department of the State of Arizona, Pima County Assessor; Pima County Board of Supervisors, Defendants–Appellees.**

No. 1 CA–TX 92–0014.

Court of Appeals of Arizona, Division 1, Department T.

March 31, 1994.

Hecker, Phillips & Zeeb by Kenneth R. Moeller, Tucson, for plaintiffs-appellants.

Stephen D. Neely, Pima County Atty. by Alison K. North, Tucson, for defendants-appellees.

## OPINION

GARBARINO, Judge.

Taxpayers Sierra Tucson, Inc., and related corporations (Sierra Tucson) appeal from a tax court judgment determining that four parcels of real property were classified as class three commercial property for *ad valorem* tax purposes.

## ISSUES

Sierra Tucson presents the following issues on appeal:

(1) whether the tax court erred in holding that Sierra Tucson's property was not "structured to the care or housing of handicapped persons ..." within the meaning of Arizona Revised Statutes Annotated (A.R.S.) section 42–162(A)(5)(c); and

(2) whether the tax court erred in holding that the portion of Sierra Tucson's facility licensed as a "special hospital" could not, in any event, qualify as class five, rather than class three, property under A.R.S. section 42–162(A)(5)(c).[1]

We have jurisdiction pursuant to A.R.S. section 12–2101(B). The appeal is assigned to Department T of this court pursuant to A.R.S. sections 12–120.04(G) and 12–170(C).

## BACKGROUND

Sierra Tucson owns four contiguous parcels of real property in northern Pima County. At all material times, Sierra Tucson operated a for-profit health care facility on its property. The facility consists of a 70–bed residential unit for the treatment of eating disorders, a 400–seat auditorium, a 23–bed medical building for detoxification and assessment, five separate 32–bed residential treatment communities, and a program center that provides food preparation services, dining areas, and recreational facilities. The facility houses a total of 253 beds. Ninety-six beds are licensed as a "behavioral health residential facility" by the Arizona Department of Health Services (DHS). The remaining 157 beds are licensed as a "special hospital" by DHS.

Sierra Tucson provides treatment to persons who suffer from chemical dependencies and mental, psychological, emotional, behavioral, and eating disorders. It provides medical, nursing, and other health-related services through its staff of physicians, psychologists, psychiatrists, and other medical profes-

---

1. A.R.S. section 42–227(A)(3) and (5) provide that class three property is assessed at 25% of full cash value, while class five property is assessed at 10% of full cash value.

sionals. Sierra Tucson's treatment approach combines principles and practices from the medical, psychiatric, psychological, family systems, and self-help communities.

About one-third of the patients who come to Sierra Tucson are primarily diagnosed as chemically dependent. Many also have other addictions or mental illnesses. Persons admitted to Sierra Tucson may suffer dysfunction in many areas of their lives—socially, in relationships, physical health, jobs, finances, and significant ongoing emotional discomfort. The typical length of stay for a chemically-dependent patient at Sierra Tucson is thirty days, thirty-three or thirty-four days for a person with emotional problems, and forty-two days for a person with an eating disorder.

Upon arrival at Sierra Tucson, the patient typically spends three days in the detoxification, orientation, and evaluation unit. There, the patient undergoes a battery of tests to determine the appropriate unit for placement. The patient is then assigned to a residential community to participate in daily group therapy in both small and large groups and to attend lectures. During the third week, the patient's family members are invited to participate in the treatment process. In the final week, the patient starts to work with continuing care counselors to determine appropriate aftercare. Sierra Tucson helps refer patients to counselors and sponsors in their home environment or at extended care facilities. The goal of the treatment at Sierra Tucson is to give patients "structured tools to improve their life functions when they return to their environment."

Since its inception, Sierra Tucson has viewed alcoholism and other addictions "as a disease and a disability." According to Dr. James F. Graham, medical director at Sierra Tucson, dependency or addiction is defined in terms of loss of control and compulsive, continued use despite adverse consequences. Dr. Graham testified:

> [T]he reason you treat any illness is to return people to function.... [T]hat's why we exist. We exist to treat an illness that we think is a treatable illness.
>
> In terms of looking at an addiction disease as a chronic progressive illness, we

think that it's a life-threatening disease if it's not treated, and that it is a treatable disease. It's not a curable disease because it's a chronic progressive illness. We treat this disease to return people to society and to family and to function.

Dr. Graham also testified:

> Q. We talked a little bit about dysfunctions that limited major life activity. If a handicap is defined as an impairment that substantially limits a major life activity such as caring for one's self or learning or working, would you consider the majority of patients that arrive at Sierra Tucson to be handicapped?
>
> A. I think that I would. In terms of how a person is handicapped, he can't perform function in his life in a vital area of his life, he can't provide for himself, he can't provide for his children. He is impaired, and he's handicapped. He's dysfunctional.
>
> . . . .
>
> In the concept of how we understand health care in this country, a person who has a heart attack who is in ICU is out on the floor for a while, and then he is home. He is dealing with a chronic illness. Then he may go to a lesser level of care, rehabilitation. Then he may go to a cardiologist every 60 days or 90 days. That's a life long process. He has chronic, progressive heart disease.
>
> It's the same thing with addiction disease and mental illness. We see that as a life long process, the treatment of the disease. It's a treatable disease, admittedly. And that is why I do this is because I think people can get weller than well with this disease. But for a period of time, they are extremely dysfunctional and they need levels of care designed to carry them through the dysfunction and restore them to society.

Dr. Graham testified that most people who successfully complete the Sierra Tucson program can take care of personal hygiene, get dressed, perform manual tasks, walk, see, hear, breathe, learn, and work. People who complete the Sierra Tucson program have an eighty percent to ninety percent chance of sustained recovery.

218

Sierra Tucson's facility was operated as a guest ranch under a previous owner in the early eighties. At that time the property held a class six (residential rental) classification pursuant to A.R.S. section 42–162(A)(6). Under A.R.S. section 42–227(A)(6) in 1991, class six property was assessed at 13 percent of full cash value. Sierra Tucson bought the property in January 1984 and has operated it as a medical facility since that time. The property retained its class six classification. In 1987, Sierra Tucson sought and obtained a class five classification under a former Pima County Assessor.

In 1991, a field inspector for the Pima County Assessor's Office observed a new structure on Sierra Tucson's property. The assessor's office added the new improvement to the tax roll and at the same time changed the entire property's classification to class three (commercial) pursuant to A.R.S. section 42–162(A)(3). For tax year 1991, A.R.S. section 42–162(A)(3)(a) provided:

> There are established the following classes of property for taxation: ... (3) class three: (a) through tax year 1991, all real and personal property devoted to any commercial or industrial use other than property included in class one, two, four, five(b), five(c), six or seven.

At a hearing held pursuant to A.R.S. section 42–405, the Pima County Board of Equalization agreed that the property should be classified as class three property. Sierra Tucson appealed that determination to the State Board of Tax Appeals, which affirmed it.

Sierra Tucson brought this action in the Arizona Tax Court in August 1991. Its complaint sought reclassification under class five pursuant to A.R.S. section 42–162(A)(5)(c), which provides:

> Through tax year 1991, all real property and improvements to such property and personal property used for the operation of licensed residential care institutions or licensed nursing care institutions which provide medical services, nursing services or health related services *and are structured to the care or housing of handicapped persons or persons sixty-two years of age or older*. (Emphasis added).

The parties filed cross-motions for summary judgment, focusing primarily on whether Sierra Tucson's facility was "structured to the care or housing of handicapped persons...." The tax court ruled:

> There is no definition of handicapped person readily at hand for the guidance of the Court. Dictionary definitions suggest that a handicapped person is one with a disability that makes achievement unusually difficult. Such a definition would include persons who were temporarily ill. The Court holds that the legislature intended that the definition [of] "handicapped persons" be distinguishable from the definition of "sick persons." The Court, therefore, holds that in order for such a facility to be entitled to class 5 classification, it must be one in which its patients are suffering from a disability, mental, physical, or emotional, which is permanent in nature, or so nearly so that the time to recovery makes incapable of rational prognosis any evaluation of the person's ability to achieve a normal life function.

> Utilizing the definition which the Court has just announced, the Court does not have enough facts to determine whether the persons who are residents of the Taxpayer's facility would qualify as handicapped persons.

The tax court set the case for trial.

After a trial to the court on July 13, 1992, the tax court ruled:

> In the statement of facts submitted with Taxpayer's motion for summary judgment, it stated that it was a licensed residential care institution. This fact was not disputed by the taxing authorities.

> At trial, however, evidence was submitted which indicated that the facility operated by the Taxpayer operated under two licenses and that specific and different beds were operated under each of the two different licenses.

> The Court holds that A.R.S. section 42–162(A)(5)(c) authorizes class 5 classification only for "licensed residential care institutions or licensed nursing care institutions." That portion of the Taxpayer's facility which operates as a special hospital is not

entitled to class 5 classification regardless of whether services performed by the Taxpayer are structured to the care or housing of handicapped persons.

There are four parcels of property defined by the Pima County Assessor which are the subject of this tax appeal. There was no evidence presented to the Court which would permit the Court to identify by parcel number that portion of the facility operated as a special hospital and that portion operated as a behavioral health residential institution.

. . . .

General hospitals and special hospitals operated for profit are classified in class 3, the same classification as the Taxpayer. The legislature has provided a significant tax benefit to residential health care facilities which are structured for the care of handicapped persons. Sierra Tucson claims that benefit.

There is no definition of the word "handicapped" in chapter 1 of Title 42, the chapter in which A.R.S. section 42–162 is found. If the Court were to accept the definition urged by the Taxpayer, handicapped would include everyone unable to achieve a normal life function, whether such lack of ability is temporary or not. This would include persons with any chronic medical condition. The Court does not believe the legislature intended such a broad definition of "handicapped." This holding is the holding of the Court announced on April 2, 1992.

The Court finds that the illnesses treated by the Taxpayer are not such illnesses that those who suffer from them are handicapped persons such as are contemplated by A.R.S. section 42–162(A)(5)(c).

The Court therefore enters its verdict in favor of Pima County and the Department of Revenue.

The tax court entered formal judgment in accordance with its ruling. Sierra Tucson timely appealed.

## ANALYSIS

Sierra Tucson contends the tax court erred in interpreting "handicapped" within A.R.S. section 42–162(A)(5)(c) as subsuming the at-tributes of permanence or indefiniteness. Sierra Tucson invokes the well-settled rule that an undefined word or phrase in a statute is to be given its ordinary meaning unless it appears from the context or otherwise that a different meaning is intended, *McIntyre v. Mohave County*, 127 Ariz. 317, 319, 620 P.2d 696, 698 (1980), and that the ordinary meaning of such a word can be found by referring to an established, widely respected dictionary. *State v. Wise*, 137 Ariz. 468, 470, 671 P.2d 909, 911 (1983).

Sierra Tucson notes that *Random House Dictionary of the English Language* (Unabridged 2d ed. 1987) defines "handicapped" as "physically or mentally disabled" and that *Webster's Ninth New Collegiate Dictionary* (1986) similarly defines it as "having a physical or mental disability that substantially limits its activity, especially in relation to employment or education." Sierra Tucson reasons:

> These dictionary definitions are broad in scope, encompassing both physical and mental impairments. Significantly, the definitions do not limit handicap based on the cause, duration or permanence of the disability causing the handicap, or on whether or not the disability may be eventually remedied through medical treatment. The definition of "handicapped person" would therefore necessarily include persons suffering from mental disabilities or impairments which substantially limit activity and which are caused by alcoholism, chemical dependencies or mental and personality disorders which are susceptible to treatment and possible cure.

Sierra Tucson also refers us to a number of Arizona and United States statutory definitions of "handicapped" to buttress its analysis. *See* A.R.S. § 23–501(3) (pertaining to vocational rehabilitation); A.R.S. § 41–1461(4) (employment discrimination—current or recent use of alcohol or drugs excluded); A.R.S. § 38–492(C) (Arizona civil service preferences); 1 C.F.R. § 326.103 (1991) (Rehabilitation Act of 1973—handicap discrimination in government programs); 42 U.S.C. § 12102(2) (Americans With Disabilities Act); Federal Register No. 86, p. 22686 (May 4, 1977) (drug addiction and alcoholism are

"physical or mental impairments" within section 7(6), Rehabilitation Act of 1973); A.R.S. § 28–881 (handicapped parking sticker for "person who is permanently physically disabled").

■ We agree with Sierra Tucson that words and phrases in statutes are to be "*construed according to the common and approved use of the language.*" A.R.S. § 1–213. In interpreting the meaning of a statute, we seek to discern the legislature's intent, looking primarily to the statutory language and giving effect to statutory terms in accordance with their commonly accepted meanings. *State v. Reynolds*, 170 Ariz. 233, 234, 823 P.2d 681, 682 (1992). We also agree that reference to established, respected dictionaries is appropriate in determining the commonly accepted meaning of words in a statute. *State v. Wise*, 137 Ariz. at 470, 671 P.2d at 911. Our own research reveals some 589 Arizona opinions reported from 1 P.2d through 855 P.2d that rely on dictionary definitions in interpreting legal terms.

■ We do not, however, interpret the dictionary definitions of "handicapped" in the same way as Sierra Tucson, nor do we share its view of the common meaning of that word. Both the dictionary definitions on which Sierra Tucson relies define "handicapped" in terms of "disability" or "disabled." The *Random House Dictionary* defines "disabled" as follows:

> *adj.* 1. Crippled; injured; incapacitated—*n.* 2. (*used with a plural v.*) persons who are crippled, injured or incapacitated (*usually prec. by the*): *Ramps have been installed at the entrances to accommodate the disabled.*

*Id.* at 560.

The *Random House Dictionary* defines "disability" as:

> 1. Lack of adequate power, strength, or physical or mental ability; incapacity. 2. A physical or mental handicap, esp. one that prevents a person from living a full, normal life or from holding a gainful job. 3. Anything that disables or puts one at a disadvantage: *His mere six-foot height*

*will be a disability in professional basketball.*

*Id.* at 560.

Contrary to Sierra Tucson's assertion, these definitions of "disabled" and "disability" connote inherent, indefinite physical or mental incapacity.

One of the dictionaries most frequently cited in Arizona case law is *Webster's Third New International Unabridged Dictionary* (G. & C. Merriam Co. 1969). The definition of "handicapped" in *Webster's* likewise comprehends an element of permanence or indefiniteness. It defines "handicap" as follows:

> 2 ... b: a *disadvantage* that makes achievement unusually difficult, *esp:* a physical **disability** that limits the ability to work.

*Id.* at 1027 (emphasis added).

*Webster's* defines "disadvantage" in pertinent part as:

> 2 ... b: an unfavorable or prejudicial quality or circumstance: HANDICAP....

*Id.* at 643.

*Webster's* defines disability in pertinent part:

> 1 ... b: (1) the condition of being disabled: deprivation or lack *esp.* of physical, intellectual, or emotional capacity or fitness; also: an instance of such a condition, a particular weakness or inadequacy ... (2): the inability to pursue an occupation or perform services for wages because of physical or mental impairment ... (4) a physical or mental illness, injury or condition that incapacitates in any way [as a result of a personal accident ... he lost his right arm, but he overcame this ...].

*Id.* at 642. *See also*, 39A C.J.S. *Handicap* at 348, *citing State v. Turner*, 3 Ohio App.2d 5, 209 N.E.2d 475, 477 (1965), *quoting Webster's Third New International Unabridged Dictionary.*

The *Oxford English Dictionary* (1933) ("OED"), perhaps the most extensive and thorough dictionary of the English language, further supports the connotation of permanence or indefiniteness in its definition of the word "handicapped." The 1976 OED supplement defines "handicapped" in part as: "of persons, esp. children, physically or mentally

defective." (Supp.1976 at 24.) OED Volume III (1933) defines "defective" as: "having a defect or defects; wanting some essential part or proper quality; faulty, imperfect, incomplete." *Id.* at 129.

The various special statutory definitions of "handicapped" on which the parties rely are of little assistance in determining the common, ordinary meaning of that term. None are truly *in pari materia* with A.R.S. section 42–162(A)(5)(c). Further, when a legislative body defines a term in a statute, it may intend to adopt and codify the common, ordinary meaning of the term or, equally likely, to expand, limit or change that meaning to suit its particular purposes. None of the statutory definitions on which the parties rely give any clear signal about the nature of the legislative body's approach in each particular circumstance.

Of the statutes to which the parties call our attention, the most nearly congruent to A.R.S. section 42–162(A)(5)(c) is the National Housing Act, 12 U.S.C. section 1701 *et seq.*, which concerns housing for elderly or handicapped families. 12 U.S.C. section 1701(q) provides in part:

> (4) [A] person shall be considered handicapped if such person is determined, pursuant to regulations issued by the secretary, to have an impairment which (A) is expected to be of long-continued and indefinite duration, (B) substantially impedes his ability to live independently, and (C) is of such a nature that such ability could be improved by more suitable housing conditions. . . .

In our opinion, parts (A) and (B) of this definition skillfully articulate the common, ordinary meaning of "handicapped."

Our interpretation of A.R.S. section 42–162(A)(5)(c) is also supported by the statute's own substance and configuration. Subsection (c) requires that the property be structured, not for "treating" handicapped or elderly persons, but rather "to [their] care or housing. . . ." "Care or housing" implies a permanent or indefinite state of affairs rather than a temporary one. Further, subsection (c) juxtaposes "handicapped persons" with "persons sixty-two years of age or older." Being sixty-two or older is a permanent, indefinite condition. The coequal coupling of that phrase with "handicapped persons" indicates that the legislature viewed both conditions as occupying the same category.

The tax court correctly held that Sierra Tucson's facility was not "structured to the care or housing of handicapped persons . . ." within A.R.S. section 42–162(A)(5)(c), and that the facility was accordingly not entitled to class five classification for tax year 1991. Because of our resolution of this issue, we need not consider whether the tax court erred in holding that the portion of Sierra Tucson's facility licensed as a "special hospital" could not in any event qualify as class five property under A.R.S. section 42–162(A)(5)(c).

Affirmed.

WEISBERG, P.J., and CLABORNE, J., concur.