186 Ariz. 97 (1995)
919 P.2d 1368
Barbara LITTLE, by and for herself and as guardian and natural mother of Howard Watterson, a minor, Plaintiff/Appellant,
v.
ALL PHOENIX SOUTH COMMUNITY MENTAL HEALTH CENTER, INC., an Arizona corporation; Human Dynamics, a business entity, Defendants/Appellees.
No. 2 CA-CV 95-0256.
Court of Appeals of Arizona, Division 2, Department A.
December 26, 1995.
As Corrected January 26, 1996.
Review and Cross-Petition for Review Denied July 2, 1996.
*98 Begam, Lewis, Marks & Wolfe, P.A. by Cora Perez, Phoenix, for Plaintiff/Appellant.
Struckmeyer and Wilson by Donald R. Wilson and Stephen D. Hoffman, Phoenix, for Defendants/Appellees.
OPINION
PELANDER, Judge.
Plaintiff/appellant Barbara Little (plaintiff) appeals from the trial court's directed verdict entered in favor of defendants/appellees (defendants) All Phoenix South Community *99 Mental Health Center, Inc. (Phoenix South) and Human Dynamics Institute (HDI) at the close of plaintiff's case-in-chief during a jury trial. For the reasons stated below, we reverse and remand.
FACTS AND PROCEDURAL HISTORY
The facts, viewed in a light most favorable to plaintiff, are as follows. Plaintiff married Dennis Little in 1988. Dennis first showed signs of mental imbalance in March 1989. In April, he set their house on fire and was charged with arson. After his release from jail, plaintiff took him to St. Luke's Hospital emergency room on May 9, 1989, for a psychiatric evaluation. Dennis told a psychiatric nurse there that he had thoughts of committing suicide and homicide, and that he had thought of killing plaintiff and his father. Dennis was admitted into the psychiatric intensive care unit and discharged from the hospital two days later for insurance reasons.
The Littles' insurance carrier had a contract with HDI to establish mental health treatment plans. Phoenix South, a mental health care/substance abuse treatment center which ran a variety of programs in the Phoenix area, operated HDI, a program that primarily delivered behavioral health care services. On May 11, counselor Jody Johnson of HDI performed a crisis assessment of Dennis, noting that, "Client appears at risk of hurting himself or his wife, has made threats to that effect during the last few days, by his own admission & according to his wife." Dennis was then admitted to the East Valley Camelback Hospital, where he remained until May 29, 1989.
On May 30 and July 10, Dennis was seen by counselors at Family Dimensions, another division of Phoenix South. On May 30, a Family Dimensions psychiatrist noted that Dennis "was abusive to wife." Family Dimensions' July 10 note indicated that Dennis "fights with wife." Although Dennis was supposed to continue with the counseling sessions after that, he did not do so. In late July 1989, Dennis assaulted plaintiff and was arrested. During the first week of August, he left the state with the couple's infant daughter, but was apprehended in Texas and extradited to Arizona. He was jailed until September 29, when he entered another treatment program, Teen Challenge. Dennis left that program on October 3 and sought help from plaintiff, who allowed him to stay with her if he renewed treatment with HDI.
Dennis called HDI and was assessed there, again by Jody Johnson, on October 4, 1989. At that time he expressed a need and desire for in-patient hospitalization because he "just didn't think things was going right" and "was afraid [he] might hurt [plaintiff]." Dennis knew that if he stayed around too long, he would end up hurting plaintiff or she would hurt him, and he told Ms. Johnson that he "was having these stupid thoughts and [felt] like things was going wrong." Dennis described the "stupid thoughts" as "when you are depressed and ... not working, you know, you think about all kinds of stuff, armed robbery, murder, arson [and] ... suicide." Dennis had "a lot of those" thoughts about harming plaintiff. The thoughts were more serious than in April, when he set fire to the house. Dennis told Ms. Johnson "that suicide thoughts was coming back and I was not on my medication ... [a]nd I'd kind of like, you know, to talk to somebody about it."
HDI's October assessment noted that Dennis "demonstrated obsessive & paranoid thinking re: his wife, but he recognized the inappropriateness of those ideations. He expressed passive suicidal ideations in terms of helplessness & hopelessness, but denied any current intent or plan to harm himself." Instead of hospitalizing Dennis, HDI placed him in the "Respite" program, a structured care treatment program in which patients received room and board supervised by a trained staff. There was no evidence that the Respite staff was furnished with any written documentation concerning Dennis, such as his prior hospital records or crisis assessments. The program did not provide psychiatrists or psychologists, and Respite staff was specifically instructed to provide no "counseling, therapy, advising, consulting." Rather, their function was to serve as a "companion."
On October 5, 1989, Dennis left his Respite apartment and went to plaintiff's home. He became angry after she refused to have unprotected *100 sexual relations with him. Plaintiff described what happened then:
I came out of the restroom, and he was sitting on the bed, just sitting at the end of the bed looking down or something. And I went over to sit down on the bed to put my shoes on and happened to glance down on the floor, and there's this butcher knife laying on the floor next to the bed.... I thought he was going to murder me.... I picked up the knife. And the first thing I did was I started praying out loud.... and the next thing I did was I said: What is this knife doing here? And then he broke down and started crying. And said: Oh, I was going to kill myself.
Plaintiff took Dennis back to the Respite program, where she told a staff member there about the above incident, and that she feared that Dennis "was going to either hurt himself or both of us." The staff member specifically asked Dennis about a knife. Plaintiff told another HDI employee that she was afraid and that Dennis needed therapy but had received none in the Respite program.
On the evening of October 6, Dennis picked plaintiff up from work and the children from the babysitter, and they all returned home. As plaintiff changed out of her work clothes and planned to take Dennis back to Respite, he entered the bedroom, stabbed her several times with a kitchen knife and then fled from the house. Due to multiple stab wounds and a collapsed lung caused by the incident, plaintiff was hospitalized for six days and off work for two months. Both she and her minor son, who was in the home at the time of the assault, required psychological counseling to deal with the incident.
In her complaint, filed on behalf of herself and her son, plaintiff alleged that Phoenix South and HDI owed a duty, not only to Dennis but also to them, "to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the same profession" in Arizona. Plaintiff further alleged that Phoenix South and HDI breached their duty of care by, inter alia, "negligently and carelessly refus[ing] to hospitalize Dennis Little although he was clearly a danger to himself and others."
The case was tried to a jury. At the close of plaintiff's case-in-chief, defendants moved for a directed verdict, contending that plaintiff had failed to present sufficient evidence to establish a claim under A.R.S. § 36-517.02, which provides in pertinent part as follows:
A. There shall be no cause of action against a mental health provider nor shall legal liability be imposed for breaching a duty to prevent harm to a person caused by a patient, unless both of the following occur:
1. The patient has communicated to the mental health provider an explicit threat of imminent serious physical harm or death to a clearly identified or identifiable victim or victims, and the patient has the apparent intent and ability to carry out such threat.
2. The mental health provider fails to take reasonable precautions.
Defendants further contended that the statute provided the exclusive basis of liability in this case. In granting the directed verdict for defendants, the trial court noted that "reasonable minds can't differ that there was not an explicit threat conveyed or communicated to the [defendants] by the patient, either directly or indirectly." The court further determined that § 36-517.02 did not "abrogate" the cause of action and therefore is constitutional, noting that "the legislature can basically define this standard of care or actually define the duty to nonpatients because there are a lot of considerations." This appeal followed.
STANDARD OF REVIEW
A motion for directed verdict admits the truth of all competent evidence introduced by the party opposing the motion, and all reasonable inferences to be drawn therefrom. Robertson v. Sixpence Inns of America, Inc., 163 Ariz. 539, 543, 789 P.2d 1040, 1044 (1990). "A directed verdict is proper if reasonable minds could not differ on the inferences or conclusions that could be drawn from the evidence, and the party for whom it is granted is entitled to judgment as *101 a matter of law." Rourk v. State, 170 Ariz. 6, 9, 821 P.2d 273, 276 (App. 1991). On appeal, we review de novo the trial court's grant of a directed verdict, examining the evidence in the light most favorable to the party against whom the verdict was entered. Shuck v. Texaco Ref. & Mktg., Inc., 178 Ariz. 295, 297, 872 P.2d 1247, 1249 (App. 1994). We also review de novo statutory interpretation issues and constitutional claims because they involve questions of law. Norquip Rental Corp. v. Sky Steel Erectors, Inc., 175 Ariz. 199, 202, 854 P.2d 1185, 1188 (App. 1993).
DISCUSSION
1. Background
In Hamman v. County of Maricopa, 161 Ariz. 58, 775 P.2d 1122 (1989), our supreme court first addressed a mental health care provider's duty to protect others against the conduct of a patient. After discussing the two major trends in other jurisdictions, the court adopted the Tarasoff[1] approach, holding that "[w]hen a psychiatrist determines, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, the psychiatrist has a duty to exercise reasonable care to protect the foreseeable victim of that danger." Id. at 64, 775 P.2d at 1128. The court further held "that the duty extends to third persons whose circumstances place them within the reasonably foreseeable area of danger where the violent conduct of the patient is a threat." Id. at 65, 775 P.2d at 1129. The supreme court specifically rejected as "too narrow" the standard articulated in Brady v. Hopper, 570 F. Supp. 1333 (D.Colo. 1983), aff'd, 751 F.2d 329 (10th Cir.1984), which held a psychiatrist liable only if the patient specifically threatened a readily identifiable victim. Hamman, 161 Ariz. at 63, 775 P.2d at 1127.
Approximately three months after Hamman was decided, in direct response to that decision, the Arizona legislature enacted A.R.S. § 36-517.02, effective April 25, 1989. The trial court's entry of a directed verdict for defendants was based solely on that statute, which the court found to be constitutional. Plaintiff contends that the trial court erred in directing a verdict for defendants because § 36-517.02 only supplements Hamman's principles and, in any event, she presented sufficient evidence to support a prima facie claim of liability under both § 36-517.02 and Hamman. Plaintiff also argues that the statute, if construed restrictively, unconstitutionally abrogates the common law cause of action established in Hamman, in violation of Ariz. Const. art. 18, § 6.
Courts should decide cases on nonconstitutional grounds if possible, avoiding resolution of constitutional issues, when other principles of law are controlling and the case can be decided without ruling on the constitutional questions. See, e.g., Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993); Petolicchio v. Santa Cruz County Fair & Rodeo Ass'n, 177 Ariz. 256, 259, 866 P.2d 1342, 1345 (1994). Accordingly, we address the issues in the order presented above.
2. Did plaintiff present sufficient evidence to support a prima facie claim of liability under A.R.S. § 36-517.02?

We initially dispose of plaintiff's contention that § 36-517.02 simply sets forth "a negligence per se standard, while leaving intact the Arizona common law." According to plaintiff, the statute supplements, rather than supplants, the common law standards established in Hamman. Plaintiff offers no authority or reasons to support her contention, nor can we find any. Section 36-517.02 expressly provides that "[t]here shall be no cause of action" nor any "legal liability" against a mental health provider unless the requirements of subsection (A) are met. That wording removes any doubt that the *102 statute was intended to be the exclusive means of establishing liability in this context.
In addition, "[i]t is well settled that the legislature is presumed to know existing law when it enacts a statute." Wareing v. Falk, 182 Ariz. 495, 500, 897 P.2d 1381, 1386 (App. 1995). Minutes of the Senate hearings relating to the proposed legislation (H.B. 2013, now § 36-517.02) indicate that it was a response to the Hamman decision.[2] The legislature clearly was aware of Hamman when it enacted § 36-517.02, and intended the statute to clarify when and to whom a mental health provider owes a duty of care. Thus, the statute was intended to supersede, not merely supplement, the duty recognized in Hamman. See A.R.S. § 1-201 ("The common law only so far as it is ... not repugnant to or inconsistent with ... the constitution or laws of this state ... shall be the rule of decision in all courts of this state."). In light of the clear legislative intent and the statute's unambiguous wording, we cannot fairly construe it differently simply to avoid resolution of a constitutional issue.
To establish liability against defendants under § 36-517.02, plaintiff was required to show that "[t]he patient [had] communicated to the mental health provider an explicit threat of imminent serious physical harm or death to a clearly identified or identifiable victim." § 36-517.02(A)(1). Plaintiff urges us to construe the statute to include nonverbal threats or insinuations. In essence, she argues that, to a mental health professional trained to understand mentally ill patients, "an explicit threat" should not be limited to statements such as "I intend to kill my wife immediately." Plaintiff further contends that "the rambling discourse of a schizophrenic patient who asks to be put into a mental hospital because he has `stupid thoughts' of armed robbery, murder, arson and suicide" is sufficient to meet the requirements of § 36-517.02(A)(1). We disagree.
"The legislature is presumed to express its meaning as clearly as possible and therefore words used in a statute are to be accorded their obvious and natural meaning." Deatherage v. Deatherage, 140 Ariz. 317, 320, 681 P.2d 469, 472 (App. 1984). Where a statute is clear and unambiguous, it should be construed so as not to defeat its plain meaning. State v. Felkins, 156 Ariz. 37, 39, 749 P.2d 946, 948 (App. 1988). See A.R.S. § 1-213 ("Words and phrases shall be construed according to the common and approved use of the language."). "[R]eference to established, respected dictionaries is appropriate in determining the commonly accepted meaning of words in a statute." Sierra Tucson, Inc. v. Pima County, 178 Ariz. 215, 220, 871 P.2d 762, 767 (App. 1994).
As plaintiff correctly notes, § 36-517.02 does not specifically require a verbal communication from patient to mental health provider, and the definition of "communicate" includes "to impart" or "transmit" information in any manner. American Heritage Dictionary 299 (2d ed. 1991). Under the clear, unambiguous statutory wording, however, the communication must be of "an explicit threat of imminent serious physical harm or death to a clearly identified or identifiable victim." The term "explicit" is commonly defined as "expressed with clarity and precision" or "clearly defined or formulated." Id. at 478. The term "threat" is commonly defined as "an expression of an intention to inflict pain, injury, evil, or punishment," id. at 1265, and the term "imminent" means "about to occur; impending." Id. at 643.
Plaintiff failed to present any evidence that Dennis "communicated," in any manner, "an explicit threat of imminent serious physical harm or death" to plaintiff in October 1989.[3] In fact, both plaintiff and Dennis acknowledged *103 that he did not communicate to defendants any express threat of imminent serious physical harm to plaintiff.
Plaintiff further contends that the Respite case notes of October 5, 1989, in conjunction with Dennis's expression of "stupid thoughts," constitute "damning evidence" of an "explicit threat" for purposes of § 36-517.02. We disagree. Those case notes state as follows:
Client returned with wife who was very concerned. She reported client threatening suicide & demanding she have another baby. I [Bill Wessel] talked with client for about an hour. He expressed the anger he has been "stuffing" all these years & we talked about what that is doing to him. He shed a couple of tears but would not allow himself to really cry. Client went to bed at 2250, saying he feels better. I told him I would check on him about mid-night. He also said he would not do anything tonight and agreed to talk with staff tomorrow.
Based on those notes, Dennis was not threatening anyone other than himself on October 5. We conclude that there was insufficient evidence to support a claim under § 36-517.02.
3. Did plaintiff present sufficient evidence to support a prima facie claim of liability under Hamman?

Although the trial court entered a directed verdict for defendants based solely on § 36-517.02, a directed verdict may be sustained if it is correct on any ground and the result is the only one which could be reached as a matter of law. Hoffman v. Greenberg, 159 Ariz. 377, 378, 767 P.2d 725, 726 (App. 1988). If there was insufficient evidence to support a claim under Arizona's common law, then the directed verdict was proper and would be affirmed, without need for addressing any constitutional issues. Therefore, we examine the sufficiency of the evidence under Hamman.[4]
Plaintiff's liability expert, James G. Hill, M.D., testified as to the applicable standard of care and defendants' deviations from that standard.[5] Dr. Hill opined that HDI's crisis assessments and diagnoses in May and October 1989 fell below the standard of care, as did HDI's failure to adequately inquire into Dennis's history of assaultive/suicidal behavior and past hospitalizations, failure to review Dennis's prior hospital records and failure to hospitalize him in October. According to Hill, Dennis "was seriously mentally ill," "was at significant risk to do something destructive to himself or others," and it was foreseeable that Dennis was at risk of harming himself or others, including plaintiff, as a result of his "past history."
Moreover, based on their own notes, defendants were aware that Dennis was very dependent upon plaintiff, that Dennis "demonstrated obsessive & paranoid thinking re: his wife," and that Dennis had previously appeared at risk of hurting plaintiff. Plaintiff also informed defendants in October 1989 that she was afraid of Dennis.
In our view the evidence outlined above was sufficient to support a prima facie claim of liability under Hamman. The evidence presented by plaintiff indicated that defendants knew or should have known that Dennis posed a serious danger of violence to others, and that plaintiff was a foreseeable victim of Dennis's violent tendencies and therefore was "within the zone of danger." Hamman, 161 Ariz. at 64, 775 P.2d at 1128; cf. Tamsen v. Weber, 166 Ariz. 364, 802 P.2d 1063 (App. 1990); Kerrville State Hosp. v. Clark, 900 S.W.2d 425, 437 (Tex. App. 1995).
In discussing the nature and scope of a psychiatrist's duty in Hamman, our supreme *104 court "reject[ed] the notion that the psychiatrist's duty to third persons is limited to those against whom a specific threat has been made," and stated that "[t]he foreseeable victim is one who is said to be within the zone of danger, that is, subject to probable risk of the patient's violent conduct." Hamman, 161 Ariz. at 64, 775 P.2d at 1128. Like the victim of the patient's violence in Hamman, plaintiff lived with Dennis and looked after him. In addition, some of the same factual elements which precluded summary judgment in Hamman are present in this case as well, such as defendants' failure to obtain and review prior medical records, awareness of "various incidents of strange behavior [and] a few instances of violent conduct," and refusal to admit the patient for hospitalization despite pleas to do so. Id. at 59, 775 P.2d at 1123. In sum, plaintiff was a "readily identifiable [person] who might suffer harm if the [defendants were] negligent in the diagnosis or treatment of the patient," id. at 64, 775 P.2d at 1128, and plaintiff's "circumstances place[d her] within the reasonably foreseeable area of danger where the violent conduct of the patient is a threat." Id. at 65, 775 P.2d at 1129.
"The issue of duty is usually one for the court as a matter of law." Id. at 61, 775 P.2d at 1125. The trial court's directed verdict cannot be sustained based on the absence of any common law duty. "This does not mean, of course, that we find negligence." Petolicchio, 177 Ariz. at 262, 866 P.2d at 1348. Nor are defendants precluded from presenting any admissible evidence relevant to the issue of whether they determined or reasonably should have determined that Dennis posed a serious danger of violence to others. Because sufficient evidence was presented to support a prima facie claim under Hamman, however, we necessarily reach the issue of whether A.R.S. § 36-517.02(A) is constitutional.
4. Does A.R.S. § 36-517.02 unconstitutionally abrogate the common law cause of action enunciated in Hamman, in violation of Ariz. Const. art. 18, § 6?

Plaintiff contends that § 36-517.02 is unconstitutional because it abrogates the right of action established in Hamman, in violation of Ariz. Const. art. 18, § 6.[6] As our supreme court has stated:
We deal, in this and similar cases, with recognition, denial, preemption, and abrogation of common-law damage actions. Unlike most state constitutions, the Arizona Constitution specifically protects many of these rights from legislative or executive abrogation. The right to pursue common-law damage remedies is protected by constitutional text, has origins in the foundation and history of our state, and has been jealously protected by this court's jurisprudence from the first days of statehood.
Hayes v. Continental Ins. Co., 178 Ariz. 264, 272, 872 P.2d 668, 676 (1994) (citations omitted).
This court recently interpreted and applied art. 18, § 6 in the context of a "dram shop" case, in which the trial court had ruled that, under A.R.S. § 4-312(B), "section 4-311 provided the exclusive remedy for dram shop liability." Young v. DFW Corp., 184 Ariz. 187, 188, 908 P.2d 1, 2 (Ct.App. 1995). This court held "that section 4-312(B) unconstitutionally abrogates the general negligence cause of action recognized in Ontiveros [v. Borak, 136 Ariz. 500, 667 P.2d 200 (1983)], contrary to article 18, section 6 of the Arizona Constitution." Id., 184 Ariz. at 190, 908 P.2d at 4. After reviewing our supreme court's pertinent decisions in this area,[7] the court concluded that A.R.S. § 4-312(B) failed to afford plaintiffs "a reasonable alternative to the general negligence action recognized *105 in Ontiveros when they are injured by a driver that the licensee knows or should know is intoxicated, but the driver is not `obviously intoxicated' as defined by section 4-311(C)." Id.
The situation presented by § 36-517.02 is almost indistinguishable from Young and Boswell. Like the dram shop and defamation statutes in those cases, § 36-517.02 eliminates all claims which do not fit within the confines of the statute. Moreover, § 36-517.02 heightens a plaintiff's burden of proving his or her claim, as did the statutes in Young and Boswell. The analysis espoused in Young and in the applicable supreme court decisions compels the same conclusion here that § 36-517.02 does not simply regulate but rather abrogates the general negligence cause of action recognized in Hamman.[8] The statute effectively abolishes a cause of action for a foreseeable class of plaintiffs, i.e., those persons, like plaintiff here, who are not "clearly identified" by a patient communicating "an explicit threat of imminent serious physical harm or death," § 36-517.02(A)(1), but who nonetheless may be "foreseeable victim[s] ... subject to probable risk of the patient's violent conduct." Hamman, 161 Ariz. at 64, 775 P.2d at 1128.
Defendants do not even address, let alone distinguish, Young.[9] Applying the same reasoning as in Young, we have no choice but to hold that § 36-517.02 unconstitutionally abrogates the common law cause of action established in Hamman.[10] Therefore, the trial court's directed verdict, which was based on that statute, cannot stand. The judgment for defendants is reversed and the case is remanded for further proceedings consistent with this decision.
LIVERMORE, P.J., and FERNANDEZ, J., concur.
NOTES
[1] Tarasoff v. Regents of Univ. of Cal., 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976) is the "landmark case regarding the duty of a psychiatrist to protect others against the conduct of a patient." Hamman, 161 Ariz. at 61, 775 P.2d at 1125. "Tarasoff has been `widely accepted (and rarely rejected) by courts and legislatures in the United States as a foundation for establishing duties of reasonable care upon psychotherapists to warn, control, and/or protect potential victims of their patients who have expressed violent intentions.'" Bradley v. Ray, 904 S.W.2d 302, 307 (Mo. App. 1995), quoting Peter F. Lake, Revisiting Tarasoff, 58 Alb.L.Rev. 97, 98 (1994).
[2] As one psychiatrist/sponsor of the bill stated, the proposed legislation "takes a major step forward and clarifies for families their roles and provides for the mental health provider with [sic] the ability to understand what constitutes their duty to protect."
[3] Evidence concerning defendants' first contact with Dennis in May 1989 does not support a liability claim under § 36-517.02, which requires a threat of "imminent" physical harm or death. Thus, HDI's May 11, 1989 assessment that "[c]lient appears at risk of hurting himself or his wife, has made threats to that effect during the last few days, by his own admission & according to his wife," has no bearing on HDI's statutory duty of care in October.
[4] Defendants do not even contend that plaintiff failed to present sufficient evidence to support a common law claim under Hamman. During argument on the motion for directed verdict, defense counsel conceded that "there may be a fact dispute" as to whether defendants failed to take reasonable precautions, assuming the required elements of § 36-517.02(A)(1) were met. In addition, in denying defendants' motion for summary judgment shortly before trial, the trial court stated that it was "not satisfied that all of the relevant issues of fact are undisputed."
[5] Because of unexpected illness, Dr. Hill did not testify at trial, but the trial court accepted his deposition testimony as an offer of proof as to his opinions before ruling on defendants' motion for a directed verdict.
[6] Article 18, § 6 of Arizona's Constitution provides that "[t]he right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation."
[7] See Hazine v. Montgomery Elevator Co., 176 Ariz. 340, 861 P.2d 625 (1993); Boswell v. Phoenix Newspapers, Inc., 152 Ariz. 9, 730 P.2d 186 (1986), cert. denied, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 527 (1987); Barrio v. San Manuel Div. Hosp., 143 Ariz. 101, 692 P.2d 280 (1984).
[8] The legislature is not excluded from "any meaningful enactment ... affect[ing] the amount or potential of recovery" in tort actions, and "`may regulate, so long as it does not abrogate.'" Jimenez v. Sears, Roebuck & Co., 183 Ariz. 399, 407-408, 904 P.2d 861, 869-70 (1995), quoting Hazine, 176 Ariz. at 346, 861 P.2d at 631 (Feldman, C.J., specially concurring). However, § 36-517.02 does not just "adversely affect the computation of damages the plaintiff recovers," Jimenez, 183 Ariz. at 407, 904 P.2d at 869, but rather totally deprives a foreseeable class of plaintiffs of the tort claim recognized in Hamman.
[9] In the trial court, however, defense counsel analogized to the dram shop statutes (A.R.S. §§ 4-311, -312), contending that the limited liability under § 36-517.02 was "no different than the dram shop act."
[10] Because of this disposition, we do not address plaintiff's contention that § 36-517.02 violates the special legislation clause of Ariz. Const. art. 4, pt. 2, § 19, because it grants special immunity or privilege from suit to mental health professionals.