494 P.2d 361

**STATE of Arizona et al., Appellants,**

**v.**

**DIRECT SELLERS ASSOCIATION of Arizona, a trade association, Appellee.**

**No. 10431.**

Supreme Court of Arizona,
In Banc.

March 6, 1972.

Rehearing Denied April 4, 1972.

Gary K. Nelson, Atty. Gen., by Frank Sagarino, Chief Asst. Atty. Gen., Phoenix, for appellants.

Hughes, Hughes & Conlan, by John C. Hughes, Phoenix, for appellees.

Maricopa County Legal Aid Society, by Jerry Levine, Phoenix, amicus curiae.

HAYS, Chief Justice.

This action was brought under A.R.S. § 12–1832 by the Direct Sellers Association against the state of Arizona for the purpose of obtaining a declaratory judgment, holding that A.R.S. §§ 44–5001 to 44–5008 are unconstitutional. The Superior Court, on a motion for summary judgment, declared the sections unconstitutional, and the state appealed. Upon request, pursuant to Rule 47(e), Rules of the Supreme Court, 17 A.R.S., we ordered the case transferred to this court from the Court of Appeals.

A.R.S. §§ 44–5001 to 44–5008 were enacted in May, 1970. The avowed purpose of the bill was "to regulate, not prohibit, home solicitation sales."

· More and more states are regulating home sales. There is now a "Uniform Consumer Credit Code" published as a result of several years of study, formulation, and revision by the prestigious National Conference of Commissioners on Uniform Laws. Its enactment by all states has been recommended by the American Bar Association. Utah and Oklahoma have adopted it. Acts similar to Arizona's, differing in some respects from it and from the uniform act, have been enacted in Connecticut, Florida, Georgia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, Pennsylvania, Rhode Island, Vermont, Washington, Wisconsin, Michigan, and California. England, two Australian states, and six Canadian provinces have legislated in this field. The Congress of the United States has enacted a "Truth in Lending Law," 82 Stat. 146, 15 U.S.C.A. § 1601 et seq. While this does not deal solely with home solicitation sales, it provides in Section 1635(a) that in "any consumer credit transaction in which a security interest is retained or acquired in real property . . . the obligor shall have the right to rescind the transaction, until midnight of the third business day following. . . ." In Section 1635(b), there are other provisions vesting the property in the buyer when the seller fails to retrieve it after tender by the buyer.

In Arizona, the legislature sought to accomplish its goal by provisions which contain language to the following effect:

44–5001. Defines "home solicitation sales" as those where the buyer is solicited, and the buyer's agreement is obtained, at a home other than that of the seller, and the purchase price is payable in installments. Excluded are sales pursuant to a pre-existing account with a seller whose primary business is selling goods at a fixed location, and sales made pursuant to prior negotiations at a fixed location where goods are offered for sale.

44–5002. Such sales may be cancelled by mail up until midnight of the second day after signing.

44–5003. Buyer may void a sale if the salesman offers to pay a rebate or commission for the names of prospective buyers, if the commission or rebate is contingent upon an event that is to happen after the buyer agrees to buy.

44–5004. The agreement of sale is not valid unless it contains a conspicuous notice of various matters, including the buyer's right to cancel.

44–5005. The note or other evidence of indebtedness must not be back-dated (so as to shorten the cancellation-option time), and must bear on its face the statement that it is based upon a home solicitation sale and is not negotiable. Transfer of such evidence of indebtedness shall constitute only an assignment, and the title of the assignee shall be subject to "all claims

and defenses" of the buyer against the seller.

44–5006. Within ten days after cancellation, the seller shall tender back to the buyer any payment made, the evidence of indebtedness given, and any trade-in. The buyer shall hold any merchandise delivered until his note and money are returned.

44–5007. Within twenty days after demand, the buyer shall tender, at his own home, the goods delivered to him. If seller fails to take possession within twenty days after cancellation, the goods becomes the property of the buyer, without obligation to pay. If seller has performed any services for the buyer, he is entitled to a cancellation fee of 5% or $15, whichever is less. The buyer's option to cancel shall not apply to goods or services requested in an emergency where return cannot be made.

44–5008. Violators are guilty of a misdemeanor.

No case has been called to our attention, and we have been unable to find any, in which the constitutionality of a statute of this kind has been adjudicated.

 The Direct Sellers Association of Arizona is a trade association, some of whose members conduct home sales solicitation. The association has standing to maintain this action. Arizona Fence Contractors Ass'n v. City of Phoenix Advisory & Appeals Bd., 7 Ariz.App. 129, 436 P.2d 641.

The principal challenge to the constitutionality of the home solicitation law is based on the theory that it is arbitrary and unreasonable to place home solicitation sales in a different category from sales made to the public at a fixed place of business. We are unable to agree with this contention.

A "Consumer Sales Protection Act" was introduced in the Congress in 1968. The Commerce Committee reported it out of committee with a "do-pass" recommendation, accompanied by a report which contained the following language:

"The . . . Act is designed to provide a consumer with some meaningful and readily available relief once he has succumbed to a high pressure sales pitch of a door-to-door salesman, but has subsequently had time to mull over the transaction and realize that he has made an unwanted purchase, paid an unconscionable price, or unnecessarily burdened his family with a major long-term expenditure.

. . . . . .

"Although, without doubt, unethical sales techniques are employed in all methods of retailing, the committee has limited this bill to direct selling. This is partially because . . . a disproportionate number of door-to-door sales involve misleading or high pressure sales tactics, and partially because of certain of the unique characteristics of direct selling which seem to leave the consumer particularly vulnerable: The buyer has not made a conscious decision, as by entering a store, to expose himself to a sales pitch. . . . The buyer has no way of screening the type of salesman who comes to his door, as he does in choosing the stores in which he shops. The buyer may feel intimidated into making a purchase from a salesman within the home, for there is no place to which he or she can readily escape. The buyer . . . has no opportunity for comparing value. And finally, the selling company does not have the same opportunity to police the conduct of its salesmen and their representations in the buyer's home, as it does when they operate within a store. . . .

"The committee believes that this bill will provide an effective instrument with which to combat the unscrupulous salesman, while at the same time it will not greatly burden the vast majority of ethical direct sellers."

The report goes on to state that the only major encyclopedia company against which there had been no serious complaints filed has always given its buyers the right to

cancel, and today it is the leading company in encyclopedia sales.

With the report is a letter from the Special Assistant to the President for Consumer Affairs, which states that Avon Products, Inc., one of the nation's largest door-to-door sellers, thinks that the bill would help his company by weeding out the unscrupulous operators who give the industry a bad name.

■ From all of the above information and arguments, we feel that it is abundantly clear that the door-to-door segment of the retailing industry is a proper subject for separate classification and regulation. It should also be noted that house-to-house selling has in several instances been completely prohibited by city ordinances, and the classification has been upheld by the United States Supreme Court. Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233. If a separate classification is valid for the purpose of prohibiting door-to-door sales, *a fortiori* it is valid for the purpose of merely regulating them.

■ The Direct Sellers Association also argues that even more objectionable than the classification of door-to-door sellers in a separate category, is the classification of door-to-door sellers not operating out of a "fixed location," in a separate category. The inability of management to supervise and control home solicitors operating away from the store, is greater where there is no store or fixed location containing a management motivated to try to supervise the door-to-door activities of its salesmen.

■ Another contention of the Association is that such phrases as "fixed location," "primary business," "prior negotiations," and "pre-existing account," are too vague for its members to determine whether they are exposing themselves to criminal penalties. State ex rel. Berger v. Superior Court, 106 Ariz. 365, 476 P.2d 666, answers this argument.

■ The Association also contends that a person's business is a property right which may not be destroyed by statute.

On this subject, the United States Supreme Court, in Breard v. City of Alexandria, *supra*, held:

"The Constitution's protection of property rights does not make a state or a city impotent to guard its citizens against the annoyances of life because the regulation may restrict the manner of doing a legitimate business. The question of a man's right to carry on with propriety a standard method of selling is presented here in its most appealing form—an assertion by a door-to-door solicitor that the Due Process Clause of the Fourteenth Amendment does not permit a state or its subdivisions to deprive a specialist in door-to-door selling of his means of livelihood. But putting aside the argument that after all it is the commerce, i. e., sales of periodicals, and not the methods, that is petitioner's business, we think that even a legitimate occupation may be restricted or prohibited in the public interest. . . . The problem is legislative where there are reasonable bases for legislative action. We hold that this ordinance is not invalid under the Due Process Clause of the Fourteenth Amendment."

It should be noted that the act does not *prohibit* door-to-door selling by salesmen who do not operate out of fixed locations, or who do not first have prior negotiations, etc. The act merely provides that in such cases the buyer shall have certain rights that he does not have when he buys at a retail store. Primarily, he has the right to cancel within two days, and the right to defend an action for the purchase price, even where the evidence of indebtedness has been transferred. It is a well-known fact that many, if not most, stores operating in fixed locations, permit the buyers to return merchandise without any reason other than that they have changed their minds. They do so because it is good business; customers granted such courtesies will return and buy again. There are many door-to-door sellers who never expect to see their customers again, and so do not grant such privileges.

■ Probably the Association's second most important challenge to the law is based on the theory that the state has no right to make notes and other evidences of indebtedness non-negotiable, or to provide that defenses against the seller shall remain valid against the seller's transferee. The claim is made that because of this provision in the law, all sources of financing have "dried up," and there is no one who will buy or discount the notes or contracts created by door-to-door sales. Financial institutions who previously advanced money on such contracts now refuse to do so because they fear that the buyers who signed the notes will (a) cancel, or (b) claim fraud or misrepresentation in the sale. The evidence to support this "drying up" claim is miniscule, but we will assume, *arguendo*, that it is true. The result, however unfortunate, cannot invalidate the law. A state has the right to determine what instruments are negotiable. "Real" defenses—those which are available even in the hands of a holder in due course—existed long before Arizona adopted the Negotiable Instruments Law (now replaced by the Uniform Commercial Code). Some states consider gambling transactions to be "real" defenses; others do not. The same is true of notes which involve usury. Whether a defense is "real" is a matter for each state's legislature. *See* Colby v. Bank of Douglas, 91 Ariz. 85, 370 P.2d 56. In the instant case, the legislature has determined that fraud, misrepresentation, breach of warranty, etc., made in the course of a home solicitation sale, are "real" defenses.

In the Association's brief in this court, it states that its members are not itinerant peddlers; that they are "established Arizona businesses operating out of fixed sites, but selling direct to the consumer in his home." If such is the case, they have no problem that is not also a problem to the retailing giants of the city with fixed locations, who also sell in the home. For example, Sears or Montgomery Ward may commence a telephone campaign to sell drapery fabrics, or it may do so by news-paper or radio ads. It may ask its prospective customers to telephone in and arrange for a decorator to come to the home with a van full of fabrics, from which the customers may pick and choose, relying upon the good taste of the store's decorator if they wish. The Association's members may do the same thing. According to the definitions in the act, such sales are not home solicitation sales, for they are made pursuant to "prior negotiations" with a seller at a business establishment where goods or services are offered for sale.

The Association has attacked nearly every word of the statute on the ground of vagueness. For example, it asks, "What is a pre-existing account?" "Must it be an open account, or can it be a stated account, or again can it be a closed account? . . ." "What is a primary business, as opposed to a secondary business?" etc. In answer to the multitude of questions asked by plaintiff in its brief, we say that every word in a statute cannot be defined with absolute clarity without unduly extending its length. If the United States Constitution were in issue here, the Association would ask, "What does 'due process' mean?" Complete specificity as to every word in an act, is impossible of attainment. We have spoken on this subject before. In State v. Cota, 99 Ariz. 233, 408 P.2d 23, we said:

> "The Constitution only requires that language convey a sufficiently definite warning as to proscribed conduct when measured by common understanding and practices. That there will be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." p. 236, 408 P.2d p. 26.

■ Another of the Association's challenges is based upon the Constitutional provision that no state shall pass any law impairing the obligation of contracts. But nothing in that provision justifies the Association's allegation that the Arizona

Legislature has deprived the door-to-door salesman of his right to contract. The provision means only that no state may impair the obligation of an *existing* contract.

■ The constitutionality of the statute is also challenged on the ground that the seller is deprived of due process by the provision that if, after notice to take back the merchandise delivered, he fails to do so, title shall vest in the buyer without any necessity of paying the purchase price. We see no difference between this provision and statutes which allow one to foreclose a mortgage or a land sale contract, by giving notice. In the foreclosure field, no one seriously doubts that title may be revested in the seller after notice, with no obligation to repay the money paid in before default.

Originally, subsection A of A.R.S. § 44–5005 contained a provision which the Association contends would expose an assignee to possible personal injury claims for latent defects in the merchandise sold. Actually, the section provided only that any "right, title or interest" of the assignee would be subject to claims. In any event, this subsection has since been modified and clarified by A.R.S. §§ 44–144 and 44–145 and arguments about it are now moot.

None of the concepts of the act are new. As just stated, "real" defenses have been known to the law of negotiable instruments for a long time. The right to study a contract *after* signing it, and to repudiate it within a short time, has long existed in the insurance field in Arizona. Every buyer of a disability insurance policy—whether in a home solicitation sale or not—has the right to cancel it within ten days and get his money back. *See* Arizona State Insurance Department Rule 61–7.

Some of the most important provisions of the law being attacked, are crystal-clear. A seller is forbidden to antedate the contract so as to shorten the time in which the buyer may cancel. A seller is required to put on the face of the contract, note or other evidence of indebtedness, a statement that it is the result of a home solicitation.

The seller must put in his contracts a prominent notice to the buyer, describing the right to cancel, and certain other rights. The seller must not offer a rebate or commission for referral sales. These requirements can hardly be expressed in a clearer manner. Failure to heed them is a misdemeanor. While there may be some areas of vagueness, the defense of vagueness will not be useful to a seller who violates these clear parts of the statute.

The Association's brief is replete with arguments that are not worthy of serious consideration. For example, it states that a buyer could cancel, and since he need tender the goods back only at his residence, he could leave town for twenty days during which the seller could not come and retake the goods, and then the buyer would own the merchandise. Obviously, such an action would not be a "tender" such as contemplated by the statute, and it is doubtful whether any trial court would interpret the act in a way that would uphold the "tender."

It argues that there is no provision for a hearing. But there is always a court of competent jurisdiction to which the seller may turn for his day in court.

It argues that cancellation is complete when the notice is posted even though it never arrives. But it has always been the law of contracts that an offer may be accepted, and that the contract is made when the acceptance is posted, even though it never arrives.

It argues that if the *buyer* predated the contract, he would be guilty of a misdemeanor. It is doubtful whether any trial court would so interpret a statute passed for the protection of the buyer; such an interpretation is neither necessary nor reasonable.

Most of these arguments depend upon a proper interpretation by the trial court, under specific facts and in specific cases.

Many of the other points made by the Association are not mentioned here because they are entirely without merit, and to answer each of them would unduly extend

this decision. It is not possible in an opinion rendered in an action for a declaratory judgment, to discuss each word of a statute and explain what it will be construed to mean. Such preciseness must come on a case-by-case basis. In legal terms, the case is not "ripe" for such detailed construction. The United States Supreme Court, in Rescue Army v. Municipal Court of City of Los Angeles, 331 U.S. 549, 574, 67 S.Ct. 1409, 1422, 91 L.Ed. 1666, held that it had jurisdiction, but declined to exercise it because "for a variety of reasons the shape in which the underlying constitutional issues have reached this Court presents, we think, insuperable obstacles to any exercise of jurisdiction to determine them." The Court spoke not only of "prematurity and comparative abstractness" and "uncertainties," but it also stated that the pleadings were not entirely clear, and that it declined to try to construe them because: "To do so would be directly contrary to the policy of avoiding constitutional decisions until the issues are presented with clarity, precision, and certainty . . . [T]he problem of extricating the applicable provisions from such a mass, together with matters of severability likely to arise, would be formidable." 67 S.Ct. at 1423–1424.

In Connecticut Mut. Life Ins. Co. v. Moore, 333 U.S. 541, 68 S.Ct. 682, 92 L.Ed. 863, the Court took jurisdiction to decide the constitutionality of a New York Statute. In Justice Jackson's dissent, he pointed out that:

"This action is for a declaratory judgment as to the validity of the Act and we are therefore passing on the Act as an entirety and in the abstract. . . . It is perhaps unfortunate to adjudicate constitutionality in such a manner. If we had before us a concrete case, contested by adversary . . . claimants . . . and based on a record that would show some facts as to residence of parties to the transaction, we would know better what we are talking about." 333 U.S. at 556, 68 S.Ct. at 690, 92 L.Ed. at 874, 875.

That problem is very much present in the instant case. It is impossible to adjudicate with positiveness a claim which has not actually arisen.

As the Supreme Court of Alabama said, in Klein v. Jefferson County Bldg. & Loan Ass'n, 239 Ala. 460, 195 So. 593, 596:

"Courts will not assume the role of legal advisor, search out and consider every constitutional question which may be raised."

With the above qualification, we hold the statutes in question to be, <em>in general,</em> constitutional, subject to questions not inherently involved at this time. Much will depend upon each individual case, the specific facts, and the way that the trial court interprets the statutes in question. When such cases appear in the trial courts, it will be their duty to recognize the presumption of constitutionality which attends all acts of the legislature, and to indulge every intendment in favor of the act's validity— McKinley v. Reilly, 96 Ariz. 176, 393 P.2d 268; to choose a construction which will result in its constitutionality's being upheld, if there are two ways to construe them— Oglesby v. Pacific Finance Corp. of Calif., 44 Ariz. 449, 38 P.2d 646; to resolve all doubts in favor of the act's constitutionality—Board of Regents of University of Arizona v. Sullivan, 45 Ariz. 245, 42 P.2d 619.

The judgment of the Superior Court is reversed, and the Superior Court is ordered to grant appellants' motion for summary judgment.

CAMERON, V. C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.