981 P.2d 584

**SAMARITAN HEALTH SYSTEM, d/b/a/ Thunderbird Samaritan Medical Center, an Arizona nonprofit corporation, Petitioner,**

v.

**SUPERIOR COURT OF THE STATE OF ARIZONA, in and for the County of Maricopa, the Honorable Donald Daughton, a judge thereof, Respondent Judge,**

Edward L. Schwartz, M.D.,
Real Party in Interest.

No. 1CA–SA97–0386.

Court of Appeals of Arizona,
Division 1, Department D.

Sept. 24, 1998.

Reconsideration Denied Dec. 8, 1998.

Review Denied May 25, 1999.

---

Mariscal, Weeks, McIntyre & Friedlander, P.A. by Gerald Gaffaney, Anne L. Tiffen, Phoenix, for Petitioner.

Ulrich, Kessler & Anger, P.C. by Donn G. Kessler and Marton & Hall, P.A. by Kraig J. Marton, Phoenix, for Real Party in Interest.

Coppersmith & Gordon P.L.C. by Andrew S. Gordon, Phoenix, for Amicus Curiae Arizona Hospital and Healthcare Association.

Teilborg, Sanders & Parks, P.C. by Kari B. Zangerle, Phoenix, for Amicus Curiae Hospital Corporation of Northwest, Inc., d.b.a. Columbia Northwest Medical Center.

WEISBERG, Judge.

¶ 1 Samaritan Health Systems ("Samaritan") filed this special action after the trial court denied its motion for summary judgment which was based, in part, on its alleged statutory immunity from this lawsuit. Dr. Edward L. Schwartz ("Schwartz") brought the underlying suit seeking damages for breach of contract and wrongful interference with prospective contractual relations ("wrongful interference"). His claims were based upon Samaritan's failure to afford him either notice or a hearing, as required by the Samaritan Health Systems Peer Review Bylaws ("Bylaws"), when it summarily suspended him from the emergency room call list ("ER–Call").[1] Samaritan responded by arguing that: (1) the Bylaws are not a contract; (2) if they are, it did not breach that contract, and (3) that it is statutorily immune from any action for damages, even if it failed to comply with its own bylaws, because it was conducting peer review. *See* Ariz.Rev.Stat. Ann. ("A.R.S.") § 36–445.02 (Supp.1997) ("§ 36–445.02").

¶ 2 We accept special action jurisdiction and grant relief in part.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 3 Schwartz is a cardiologist who has been a licensed physician for thirty-two years and was a staff member at Thunderbird Samaritan Medical Center, a hospital run by Samaritan, for more than twelve years. In 1994, Schwartz applied to renew his staff membership. While evaluating his renewal application through its peer review process, Samaritan's Medical Committee expressed concerns about the quality of Schwartz's patient care. As a result, his renewal application was denied, and he was suspended from ER–Call as of February 16, 1994. No administrative review or hearing was held regarding this suspension.

¶ 4 On July 1, 1994, Schwartz sent a letter to Samaritan requesting an "appeal" of the suspension of his membership privileges, including ER–Call. No appeal was granted. On August 1, 1994, Samaritan began a formal investigation into Schwartz's practice pat-

---

1. In hospitals, specialists are placed on ER–Call and summoned to the emergency room when a patient is diagnosed with a potential condition. As a cardiologist, Schwartz claims that a significant portion of his new clientele came from ER patients with cardiac symptoms and that the ER–Call suspension caused significant damage to his practice.

terns and suggested that possible corrective action might be taken. After negotiations between Schwartz and Samaritan, Samaritan's in-house counsel wrote a letter stating that Samaritan did not believe ER–Call was a privilege of membership and therefore Schwartz was not entitled to a hearing. But, on April 6, 1995, Samaritan informed Schwartz he could address the ER–Call suspension before a fair hearing panel, which would consider his membership.

¶ 5  On November 15, 1995, the fair hearing panel recommended that Schwartz retain his medical staff membership and privileges but that he undergo a psychological evaluation for burnout. The Medical Executive Committee subsequently voted to reinstate Schwartz but recommended that his skills be evaluated by the University of Arizona College of Medicine. On March 27, 1996, the Hospital Appeals Panel recommended that Schwartz's privileges be reinstated with the only corrective action being the review of his charts. A few weeks later, the Samaritan Board of Directors, in an ex parte proceeding, voted to require an evaluation of Schwartz's skills and a psychological assessment for him to retain membership. Schwartz responded by resigning from the hospital and filing a complaint[2] claiming that, by not affording him an expedited hearing regarding his suspension, Samaritan breached the terms of the contract as set forth in the Bylaws. He also claimed that Samaritan committed wrongful interference with prospective business relations.

¶ 6  Following discovery, both sides moved for summary judgment: Schwartz asking for judgment on liability; Samaritan arguing that the Bylaws are not a contract, that ER–Call is not a privilege of membership, and that it is statutorily immune from this suit. The trial court granted Samaritan's motion, finding that ER–Call is not a privilege of membership.

¶ 7  Schwartz, however, filed a motion for new trial and the trial court vacated the previous summary judgment. The court held that the Bylaws constitute a contract

and that membership at Samaritan includes the right to participate in ER–Call. Further, it found that the failure to provide Schwartz a hearing could constitute a breach of that contract. Samaritan then filed another motion for summary judgment, asserting, among other issues, that it is statutorily immune from damages. The court denied the motion and set this matter for trial.

¶ 8  Samaritan filed this petition for special action, arguing that it is immune from the lawsuit because Schwartz's suspension occurred during peer review and that Samaritan will suffer irreparable harm if forced to go to trial. See § 36–445.02. Schwartz responds that this lawsuit is for breach of contract, not a challenge to results of the peer review process, and thus falls outside the parameters of § 36–445.02. Further, he argues that such application of the statute would violate Article 18, section 6 of the Arizona Constitution ("the anti-abrogation clause"). After reviewing the initial briefs, we requested additional briefing on the following issue: Does the anti-abrogation clause apply exclusively to tort claims or does it extend to common law contract claims?

¶ 9  For the following reasons, we conclude that the breach of contract damage claims are barred by § 36–445.02, but that, because of the paucity of the record before us, the tortious interference claim may proceed at this time. We therefore accept jurisdiction and grant relief in part.

## DISCUSSION

### I.  Special Action Jurisdiction

¶ 10  Denial of a motion for summary judgment is inappropriate for special action jurisdiction except in very unusual cases. See Salt River Valley Water Users' Ass'n v. Superior Ct., 178 Ariz. 70, 73, 870 P.2d 1166, 1169 (App.1993). One of those unusual cases is when a defendant has claimed immunity from suit. See id. "[I]f one is 'erroneously forced to stand trial, he has lost the benefit of immunity, even if he is found not liable.'" Id. (citations omitted).

---

**2.** Because Schwartz has resigned from his position at Samaritan, his only requested relief is

damages.

Section 36–445.02(B) grants such immunity from suits for damages: "The only legal action which may be maintained by a licensed health care provider based on the performance or nonperformance of such [peer review] duties and functions is an action for injunctive relief." Furthermore, peer review is statutorily required for all hospitals in the state, *see* A.R.S. § 36–445; therefore clarification of hospitals' exposure to suit from the peer review process is of statewide importance. Because appeal is not an adequate remedy for Samaritan, and because the issue is one of statewide importance, we exercise our discretion and accept jurisdiction.

## II. Standard of Review

■ ¶ 11 We review a denial of a motion for summary judgment for an abuse of discretion. *See id.* at 74, 870 P.2d at 1170. In reviewing a motion for summary judgment, we assume that all facts alleged by the party opposing the motion are true and make all reasonable inferences in favor of that party. *See id.*

## III. The Bylaws Are A Contract

■ ¶ 12 In arguing that the Bylaws constitute a contract, Schwartz finds support in *Bock v. John C. Lincoln Hospital*, 145 Ariz. 432, 437–38, 702 P.2d 253, 258–59 (App.1985), wherein this court held that hospital bylaws can constitute a contract between a hospital and doctor. In *Bock*, a doctor brought an action seeking injunctive relief for breach of contract because the hospital did not follow its Fair Hearing Plan. *See id.* We found that the hospital bylaws were sufficient to warrant a breach of contract action. *See id.*

¶ 13 Further, Arizona courts have allowed members of private associations that fail to abide by their own bylaws to bring actions for breach of contract. *See Rowland v. Union Hills Country Club*, 157 Ariz. 301, 304, 757 P.2d 105, 108 (App.1988) ("The rights of members of a private organization are governed by the articles of incorporation and by-laws, which constitute a contract between the members and the organization ..."); *Savoca Masonry Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 395–96, 542 P.2d 817, 820–21 (1975).[3] We therefore agree with the trial court that these Bylaws constitute a contract.[4]

### A. Samaritan's Actions Breached The Contract

■ ¶ 14 Contract interpretation is a question of law we review *de novo*. *See Arizona Biltmore Estates Ass'n v. Tezak*, 177 Ariz. 447, 448, 868 P.2d 1030, 1031 (App. 1993); *Barry v. Alberty*, 173 Ariz. 387, 389, 843 P.2d 1279, 1281 (App.1992). Section 1.1 of the Fair Hearing Plan provides that "[a]ny practitioner whose **membership and/or privileges** are denied, revoked, suspended, reduced, or otherwise limited **shall be entitled to a hearing** ... unless such limitation constitutes nonreviewable action as defined in the Medical Staff Bylaws." (emphasis added).[5]

¶ 15 Under section 3.2–11, "[e]ach Staff member, regardless of assigned staff category ... shall ... [p]articipate in mandatory call coverage." *See also* Bylaws §§ 3.1 ("Staff membership is a privilege extended to practitioners who continuously meet standards and requirements set forth in these Bylaws"); § 4.2–3(b) ("An Active Staff member must ... serve on the on-call roster for

---

**3.** Additionally, other jurisdictions have held that a doctor can proceed with a breach of contract action against a hospital when the hospital refuses to abide by its own bylaws. *See Rees v. Intermountain Health Care, Inc.*, 808 P.2d 1069, 1076–78 (Utah 1991) (failure to provide due process hearing before limiting hospital privileges gives rise to breach of contract action); *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 97 (Alaska 1992) (claim against hospital for suspension of privileges arises out of contract, not application of peer review statute, and thus is not barred by statute of limitations). However, we note that the peer review statutes in those states require

hospitals to act in good faith, while ours does not. *See id.*

**4.** At oral argument, Samaritan pointed out that Schwartz signed an application waiving all claims against Samaritan for its conduct in reviewing his application. However, this waiver argument was not argued in Samaritan's briefs. Therefore, we do not address it here. *See Nationwide Resources Corp. v. Massabni*, 134 Ariz. 557, 565, 658 P.2d 210, 218 (App.1982).

**5.** ER–Call is not exempt from the hearing requirement. *See* Bylaws § 11.6.

... unassigned and emergency patients ...."). Thus, every member of the staff must participate in ER–Call.

¶ 16    The Bylaws further provide that any summary suspension of **membership or privileges** shall be reviewed by the Medical Executive Committee within ten days of the suspension. *See* Bylaws § 11.4–2.[6]  If summary suspension continues, "special notice of the decision shall be sent to the affected practitioner who may request an expedited hearing...." Bylaws § 11.4–3.

¶ 17    We therefore conclude that ER–Call is a part of membership at Samaritan, and that the right to a hearing after a suspension is a condition of membership protected by the Bylaws.[7]  In the instant case, when Samaritan allegedly failed to afford Schwartz an expedited hearing, it breached its contract with him.

### IV.   Does § 36–445.02 Apply?

¶ 18    Samaritan argues that, even if there was a breach of contract, it is immune from this lawsuit because Schwartz seeks only damages and § 36–445.02 allows only injunctive relief on issues related to peer review.  In interpreting a statute, this court must presume that the legislature expressed itself in as clear a manner as possible and that it gave words their natural and obvious meanings. *See Mendelsohn v. Superior Ct.*, 76 Ariz. 163, 169, 261 P.2d 983, 988 (1953); *Deatherage v. Deatherage*, 140 Ariz. 317, 320, 681 P.2d 469, 472 (App.1984).  Also, words in statutes are interpreted according to their common and approved usage. *See* A.R.S. § 1–213; *Coast to Coast Mktg. v. Gor-*

*don B. Hamilton Co.*, 164 Ariz. 73, 74, 790 P.2d 771, 772 (App.1990).

¶ 19    Arizona Revised Statutes Annotated section 36–445 requires licensed hospitals to evaluate their medical staffs through peer review.  All peer review proceedings are confidential, and those conducting peer review cannot be forced to testify about the proceedings. *See* A.R.S. § 36–445.01.  Further, § 36–445.02 provides for immunity from damage lawsuits for health care providers:

> No hospital or outpatient surgical center and no individual involved in carrying out review or disciplinary duties or functions of a hospital or center pursuant to § 36–445 may be liable in damages to any person who is denied the privilege to practice in a hospital or center or whose privileges are suspended, limited, or revoked.  The only legal action which may be maintained by a licensed health care provider based on the performance or nonperformance of such duties and functions is an action for injunctive relief to correct an erroneous decision or procedure.[8]

The Bylaws set forth the process by which Samaritan fulfills the mandates of A.R.S. section 36–445.  Therefore, the issue is whether Samaritan is statutorily immune from damages here when it allegedly has failed to follow its own Bylaws?

¶ 20    Nonperformance is defined as:

> Neglect, failure, or refusal to do or perform an act stipulated to be done.  Failure to keep the terms of a contract or covenant, in respect to acts or doings agreed upon.  The failure or neglect to render performance called for in a contract, rendering the non-performer liable in dam-

---

6.  Bylaws § 11.4–2 *Review by the Medical Executive Committee*

    The Medical Executive Committee ... shall review the summary suspension within ten (10) days.  The affected practitioner shall be notified of the date and time of the review and shall be given the opportunity to present evidence in his/her defense.

7.  In California ER–Call has been held to be a fundamental property right that cannot be suspended without notice and a hearing. *See Bergeron v. Desert Hosp. Corp.*, 221 Cal.App.3d 146, 270 Cal.Rptr. 397, 401 (1990).

8.  The legislature granted hospitals this statutory immunity because peer review is critical to promoting better patient care. *See Scappatura v. Baptist Hosp.*, 120 Ariz. 204, 210, 584 P.2d 1195, 1201 (App.1978); *Humana Hosp. Desert Valley v. Superior Ct.*, 154 Ariz. 396, 400, 742 P.2d 1382, 1386 (App.1987) (noting the "overriding public interest in candid professional peer review").  It is intended to ensure that peer review is more than cursory, "encourag[ing] full and frank discussions and decisionmaking" through a process that can be both time consuming and contentious. *See Scappatura*, 120 Ariz. at 210, 584 P.2d at 1201.

ages or subject to a decree or judgment of specific performance.

BLACK'S LAW DICTIONARY 952 (5th ed.1979). Thus, § 36–445.02 provides immunity to hospitals from damages that might otherwise arise from breach of contract or wrongful interference. Samaritan's failure to follow its own bylaws, the basis of the breach of contract claim, is an example of such nonperformance. Consequently, because § 36–445.02 limits Schwartz's remedies to injunctive relief, we must decide whether § 36–445.02 is constitutional. *See Little v. All Phoenix S. Community Mental Health Ctr., Inc.,* 186 Ariz. 97, 104, 919 P.2d 1368, 1375 (App.1996).

## V. The Anti–Abrogation Clause Does Not Apply To Contracts

¶ 21 Schwartz argues that applying § 36–445.02 here would violate the anti-abrogation clause. When reviewing the constitutionality of a statute, we must presume it is constitutional. *See Chevron Chem. Co. v. Superior Ct.,* 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982); *McClead v. Pima County,* 174 Ariz. 348, 352, 849 P.2d 1378, 1382 (App.1992). Schwartz must prove beyond a reasonable doubt that § 36–445.02 is unconstitutional. *See McClead,* 174 Ariz. at 352, 849 P.2d at 1382.

¶ 22 Schwartz asserts that all his claims are protected by the anti-abrogation clause, which provides:

The right of action to recover damages for injuries shall never be abrogated, and the amount recovered shall not be subject to any statutory limitation.

Ariz. Const. art. 18, § 6. Samaritan responds that the clause's application is limited to tort actions for four reasons: (A) the founders' use of the phrases "for injury" and "action to recover damages for injury" in the clause, which connoted tort actions in 1910; (B) legislative history from the constitutional convention that shows the clause was intended to be limited in scope; (C) subsequent case law that has limited the application of this provision to torts; and (D) the inclusion of a "contract abrogation" provision in the "Declaration of Rights" section of the Consti-

tution to ensure the courts are open to contract claims. We agree with Samaritan.

## A. The Language Of The Anti–Abrogation Clause Limits Its Application To Tort Law

¶ 23 "We interpret constitutional provisions by examining the text, and, where necessary, history in an attempt to determine the framers intent." *See Boswell v. Phoenix Newspapers, Inc.,* 152 Ariz. 9, 12–18, 730 P.2d 186, 189–95 (1986) (examining the "historical milieu in which Arizona's Constitution was adopted" to determine the meaning of the anti-abrogation clause). At the same time, "[i]t is a cardinal rule of constitutional construction that the interpretation, if possible, shall be such that each provision should harmonize with all others. Different sections or provisions relating to the same subject must be construed together and read in the light of each other." *Herndon v. Hammons,* 33 Ariz. 88, 92, 262 P. 620, 621 (1927). In interpreting the anti-abrogation clause we must try to effectuate the founders' intent in a historical context by interpreting it as part of a larger document, the Arizona Constitution.

¶ 24 Schwartz argues that the plain language of the clause applies to contract claims because there is no language limiting or restricting "damages for injury" to torts. Samaritan counters that, when the Constitution was adopted, the phrases "action to recover damages for injury" and "for injury" were used to connote tort claims while "for debt" was used to connote contracts. In other words, Samaritan argues that the founders limited the application of the clause to torts by using what was then tort language.

¶ 25 Samaritan's argument that "for injuries" and "action for damages to recover injuries" were tort language at the time of the convention is supported by a number of cases and statutes from the early days of statehood. For example, in *Benton v. Regeser,* 20 Ariz. 273, 179 P. 966 (1919), the phrase "action to recover damages for injuries sustained" was used to describe an action for damages sustained in a car accident. *See also Salladay v. Old Dominion Copper Mining Co.,* 12 Ariz. 124, 126, 100 P. 441, 441 (1909) ("This is an action to recover damages

for injuries causing the death of an infant ...".). Further, the first legislature passed a number of statutes that used "for injury" to connote torts and "for debt" to connote contracts. *Compare* A.R.S. § 12–542 (statute of limitations for tort refers to actions "for injuries") *with* A.R.S. §§ 12–543 & –548 (statute of limitations statutes for contract refer to actions "for debt").

¶ 26  While this argument alone is not conclusive, it does indicate what the founders intended when they enacted the anti-abrogation clause. We must therefore evaluate the other points raised to determine whether the application of the anti-abrogation clause should be limited to torts.

**B.  Records Of The Constitutional Convention Evidence Intent To Limit The Anti–Abrogation Clause To Tort**

¶ 27  Evidence of the founders' intent to limit the application of the anti-abrogation clause is seen in the pre-adoption evolution of the clause. The debates surrounding the clause all relate to protecting the right to sue for damages for personal injury.[9]

¶ 28  The anti-abrogation clause as it was originally introduced at the Convention as Proposition 50 read as follows:

> **Relative to Limitation of Damages for Personal Injuries**
>
> That no law shall be enacted in this State limiting the amount of damages to be recovered for causing the death or injury of any person. Any contract or agreement with any employee waiving any right to recover damages for causing the death or injury of any employee shall be void.

THE RECORDS OF THE CONSTITUTIONAL CONVENTION OF 1910 7 (John S. Goff ed., 1991) ("RECORDS"). Proposition 50 was eventually included as section three of Proposition 88, which became Article 18 of the Arizona Constitution: "A Proposition Relative to Employer's Liability." RECORDS, *supra*, at 541, 1227. Proposition 88 was intended to "insure the using of every possible safety appliance and

devise, and to make employers hold life less cheaply ... [therefore the employers] will be much more careful, and take every precaution for the safety of his employees." RECORDS, *supra*, at 882 (Delegate Cunniff). The purpose of this Proposition was to ensure that the legislature did not abrogate the rights of employees to sue for damages that resulted from accidents. *See id.*

¶ 29  During the Constitutional debates, the delegates discussed whether this provision should apply only to employees or to all injured persons. *See* RECORDS, *supra*, at 152 (Delegate Baker) ("I would like to know why everyone, whether an employee or not, should not be protected in the matter of accident, death, or injury? ... I would make it to cover all persons who may be included in an accident."). The founders decided to expand the clause to provide a "broad sweep to protect all injured persons, not just injured laborers in certain occupations." *Kenyon v. Hammer*, 142 Ariz. 69, 79 n. 9, 688 P.2d 961, 971 n. 9. While this provision has since been interpreted to include emotional as well as physical injuries, there is no evidence the founders envisioned it as applying to anything but personal injury actions.

**C.  Case Law Has Not Extended Application Of The Anti–Abrogation Clause Beyond Tort Claims.**

¶ 30  Schwartz nevertheless argues that, even if the founders did not consider applying the clause to contracts, the cases interpreting the anti-abrogation clause have expanded it to apply to all "common law damages" actions, including his common law claim for breach of contract. *See Boswell*, 152 Ariz. at 14, 730 P.2d at 191; *Bryant v. Continental Conveyor & Equip. Co.*, 156 Ariz. 193, 751 P.2d 509 (1988); *Hazine v. Montgomery Elevator Co.*, 176 Ariz. 340, 344, 861 P.2d 625, 629 (1993). But none of the cases Schwartz cites actually holds that the anti-abrogation clause applies to all common law damages. Instead, they, along

---

9.  Personal injury is defined as "any injury which is an invasion of personal rights, and ... it may include such injuries to the person as libel or slander, criminal conversation, malicious prosecution, false imprisonment, and mental suffer-

ing." BLACK'S LAW DICTIONARY, *supra*, at 541. In other words, "personal injury" includes all the torts to which the anti-abrogation clause has been applied, but not contracts.

with other relevant cases, indicate that the founders intended to limit the application of the clause to tort law.

¶ 31 In *Boswell*, our supreme court provided an expansive discussion of the history and application of the anti-abrogation clause and of the framers' intent. *See id.* at 13–18, 730 P.2d at 190–95. It did not, however, expand the anti-abrogation clause's application to "all common law damage actions."

¶ 32 The holding of *Boswell* was that the anti-abrogation clause protects the right to recover damages for emotional injury for defamation. *See id.* at 17–18, 730 P.2d at 194–95. In so holding, the court expanded the clause's application to all tort actions recognized at common law, including emotional damages. *See id.* at 15, 730 P.2d at 192. "Nothing in past decisions demonstrates that the framers intended to limit the broad language of the constitutional guarantee to protect actions for negligent torts, excluding protection for tort actions based upon strict liability." *Id.* at 14, 730 P.2d at 191.

¶ 33 In discussing its application, the court held that, while the anti-abrogation clause allows the legislature to regulate common law actions, "[it] does eliminate the legislature's power to control the existence of **tort law.**" *Id.* at 17, 730 P.2d at 195 (emphasis added). The court did not, however, rule that the clause limited the legislature's ability to control the existence of all other common law damages actions.

¶ 34 Next, in *Bryant*, the court stated that "art. 18, § 6 protects actions for negligence and breach of warranty and extends to all actions recognized at common law at the time of the article's adoption." 156 Ariz. at 195, 751 P.2d at 511. *Bryant* held that strict liability tort claims did not fall under the protection of the anti-abrogation clause, but did not expand the reach of the anti-abrogation clause to other types of claims. As a result, the above-quoted language is dicta. Moreover, we can find no later cases that have applied the anti-abrogation clause to non-tort claims.

¶ 35 Finally, in *Hazine*, the court held that the anti-abrogation clause protected the plaintiff's right to sue in strict liability despite the fact that that claim was not recognized at common law when the Constitution was drafted. *See id.* at 345, 861 P.2d at 630. While *Hazine* cited the expansive language in *Boswell* relating to common law actions, it did so in context. "The evolution of common law causes of action—whether in duty, standard of care, or damages—falls within the broad coverage of [the anti-abrogation clause]." *Id.* at 344, 861 P.2d at 629. Thus, the elements of the "common law causes of action" that can evolve and are protected by the anti-abrogation clause are those that make up tort claims.[10]

¶ 36 In addition to these cases, numerous others have limited the anti-abrogation clause by referring to it in tort terms. *See generally Alabam's Freight Co. v. Hunt*, 29 Ariz. 419, 443–44, 242 P. 658, 665–66 (1926); *Kenyon*, 142 Ariz. at 82, 688 P.2d at 974; *Estate of Hernandez v. Arizona Bd. of Regents*, 177 Ariz. 244, 253–254, 866 P.2d 1330, 1339–40 (1994) ("[U]nder [the anti-abrogation clause], Arizona's judiciary shares responsibility for the evolution of **the law of torts.**")(emphasis added); *Nolde v. Frankie*, 190 Ariz. 422, 432, 949 P.2d 511, 521 (1997) (Grant, J., concurring) ( [the anti-abrogation clause] prohibits abrogation of causes of action in tort), *review granted* (Jan. 21, 1998); *Summerfield v. Superior Ct.*, 144 Ariz. 467, 472 n. 2, 698 P.2d 712, 717 n. 2 (1985) ("[the anti-abrogation clause] of the Arizona Constitution forbids the legislature from setting any limit on personal injury damages."). We consider these decisions as further indications that the clause applies only to torts.

### D. The Constitution Has Separate Provisions Dealing with Open Courts for Contract and Tort Claims.

¶ 37 The purpose of the anti-abrogation clause was to curtail the legislature's power to limit the amount of recoverable tort damages and to ensure that tort claimants have

---

10. Further, in a concurring opinion Justice Feldman said that "[t]he 1910 Arizona Constitution ... constitutionalized the law of torts." While this does not exclude the possibility that the clause applies to contract, it is an indication that the anti-abrogation clause constitutionalized torts, but not all other common law damages actions.

open access to the courts. *See Boswell*, 152 Ariz. at 17, 730 P.2d at 194. The inclusion of two other clauses, Article 2, sections 25 and 31, highlights that the founders thought them necessary to ensure that claimants also had open access to Arizona's courts for other types of common law claims. Their inclusion also reflects the founders' intent to limit the application of the anti-abrogation clause to tort claims.

¶ 38 First, Article 2, section 31 ("the anti-limitation clause") restricts limitations upon the amount of damages for death or personal injuries:

> No law shall be enacted in this State limiting the amount of damages to be recovered for causing the death or injury of any person.

This provision strictly prohibits the legislature from limiting damages for personal injuries.[11] It is also intended to guarantee the same right as the anti-abrogation clause: open courts in Arizona. *See Kenyon*, 142 Ariz. at 79 n. 9, 688 P.2d at 971 n. 9. However, that is not the only way in which the anti-limitation clause interacts with the anti-abrogation clause.

¶ 39 Article 2 of the Arizona Constitution, entitled "Declaration of Rights," outlines numerous specific rights guaranteed to all Arizonans. The anti-limitation clause was not included in the original draft of Article 2 proposed to the Convention, but was added as an amendment by supporters of the anti-abrogation clause prior to final approval of Article 2. Supporters of the anti-abrogation clause had assumed that Proposition 50 would be included in any declaration of rights. *See Kenyon*, 142 Ariz. at 79–81 n. 9, 688 P.2d at 971–73 n. 9. However, as a result of hard-fought legislative battles, it was significantly amended and included as part of Article 18, the Labor Article. *See id.* Subsequently, when the founders were approving the different sections of Article 2, the delegate who originally introduced Proposition 50 moved that the convention should adopt the anti-limitation clause as section 31. He argued that doing so was simply "a matter of compilation" because it had already been adopted as the anti-abrogation clause, and the convention included it apparently by voice vote. *See id.* By so doing, the founders evidenced their intent that the anti-abrogation clause should work with the anti-limitation clause and with the other "rights" guaranteed by Article 2.

¶ 40 Next, Article 2 also includes a provision protecting contractual rights:

> No bill of attainder, ex-post facto law, or law impairing the obligation of a contract shall ever be enacted.

Ariz. Const. art. 2, § 25 ("the contract-impairment clause"). This provision has been held to "forbid the abrogation of contracts." *Herndon*, 33 Ariz. at 92–93, 262 P. at 621. Thus, this clause fulfills a purpose in contract similar to the one that the anti-abrogation clause and Article 2, section 31 fulfill for tort and personal injury claims.

¶ 41 Notwithstanding their similar roles, the contract impairment clause operates differently from the anti-abrogation clause. While the anti-abrogation clause forbids the legislature from abrogating any parties' common law tort claims for damages, the contract impairment clause only limits the legislature's ability to impair obligations under existing contracts. *See State v. Direct Sellers Ass'n*, 108 Ariz. 165, 170, 494 P.2d 361, 366 (1972) ("[U.S.C.A. Const. art. I, § 10, cl. 1] means only that no state may impair the obligation of an *existing* contract.") (emphasis in original). This is because all parties to a contract are presumed to be aware of the law when they enter a contract, thereby making the law part of the contract. *See Brotherhood of Am. Yeomen v. Manz*, 23 Ariz. 610, 615, 206 P. 403, 404 (1922).[12]

¶ 42 Additionally, the contract impairment clause allows the legislature to

---

11. We note that Schwartz also argued that application of § 36–445.02 would violate the anti-limitation clause. It is obvious, however, that a contract claim is not a claim stemming from "death or injury of any person." *See* Ariz. Const. art. 2, § 31.

12. For example, in the instant case, § 36–445.02 was enacted in 1976 and amended in 1984 but the Bylaws at issue were approved in 1988. Thus, § 36–445.02 was incorporated into the contract and Schwartz concedes that article 2, section 25 is not implicated in this case.

change or proscribe the remedies available in enforcing a contract, even to the point of eliminating the ability to recover damages. *See id.* "We understand the rule to be that parties have no vested right in particular remedies or modes of procedure, and that legislatures may change existing remedies or prescribe new modes of procedure without impairing the obligation of the contracts, provided the efficacious remedy remains for enforcement." *Id.* Thus, the legislature can limit contractual remedies to injunctive relief.

¶ 43  Samaritan argues, and we agree, that these three clauses, read together, ensure access to the courts for different types of claims. The anti-abrogation clause constitutionalizes tort claims recognized at common law by ensuring that persons who are injured cannot have their claims abrogated. *See Hazine,* 176 Ariz. at 344, 861 P.2d at 629. The anti-limitation clause gives similar protection to rights relating to physical injuries and was adopted "as a matter of compilation" with the anti-abrogation clause. *See Kenyon,* 142 Ariz. at 80 n. 9, 688 P.2d at 972 n. 9. The contract impairment clause limits the legislature's ability to impair existing contractual obligations, but allows for future limits on remedies because of the nature of contract law. *See Herndon,* 33 Ariz. at 92, 262 P. at 621. The founders intended that these provisions should work together, albeit in different ways, to ensure open access to the courts for the various common law claims.

¶ 44  If these provisions were not intended to work together, then the anti-abrogation clause would conflict with the contract impairment clause, which allows the legislature the right to limit remedies available under contract. *See Brotherhood of Am. Yeomen,* 23 Ariz. at 615, 206 P. at 404. Accordingly, if the anti-abrogation clause were also to apply to contracts, the legislature could not limit contract damages. Thus, a conflict between the clauses would exist, which we are instructed to avoid. *See Herndon,* 33 Ariz. at 92, 262 P. at 621. We therefore conclude that application of the anti-abrogation clause does not extend to common law contract claims.

## VI.  Wrongful Interference With Prospective Business Relationships

¶ 45  Schwartz also states a claim for wrongful interference with prospective business relationships. *See Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 386, 710 P.2d 1025, 1041 (1985) (elements of wrongful interference); *Antwerp Diamond Exchange of Am., Inc. v. Better Business Bureau, Inc.,* 130 Ariz. 523, 529–30, 637 P.2d 733, 739–40 (1981). He argues that, since this has been recognized as a common law tort action in Arizona, it would be protected by the anti-abrogation clause even if his contract claim were not. Samaritan responds by arguing that, even if the anti-abrogation clause applies to Schwartz's tort claim, § 36-445.02 regulates, rather than abrogates, the claim. *See Hazine,* 176 Ariz. at 342, 861 P.2d at 627. Samaritan also argues that Schwartz has failed to properly allege all elements of a wrongful interference claim because he has not alleged that Samaritan acted improperly in any way other than by failing to follow the Bylaws. *See Wagenseller,* 147 Ariz. at 386, 710 P.2d at 1041 (holding that, to bring a wrongful interference claim, plaintiff must show defendant acted in an improper way beyond simply interfering with the contract or expectancy).

¶ 46  In the instant case, the sufficiency of the wrongful interference claim has never been independently decided by the trial court and was only touched upon briefly both here and before the trial court. The record is simply too sparse for us to decide whether Schwartz has enough evidence to maintain a claim for wrongful interference or whether the anti-abrogation clause would apply to protect that claim. Moreover, because the trial court should decide such issues first, this immunity issue is not now ripe for special action review. *See City of Phoenix v. Yarnell,* 184 Ariz. 310, 320, 909 P.2d 377, 387 (1995)(inappropriate to rule on summary judgment issues before trial court has had opportunity to rule). Also, in the event this claim can be resolved on nonconstitutional grounds, it may be unnecessary to consider the constitutional argument. *See Little,* 186 Ariz. at 101, 919 P.2d at 1372. We therefore

deny Samaritan relief on this claim and remand it.[13]

## CONCLUSION

¶ 47   For the foregoing reasons, we accept jurisdiction and grant relief in part. Because the anti-abrogation clause does not apply to contract actions, § 36–445.02 constitutionally bars Schwartz's contract claims, and the trial court abused its discretion by denying Samaritan's cross-motion for summary judgment thereon. The trial court is therefore ordered to enter partial summary judgment on the contract claims. We also deny relief as to Schwartz' wrongful interference claim.

CONCURRING: E.G. NOYES, JR., Judge, and EDWARD C. VOSS, Judge.

---

**13.** We note that the Supreme Court has held we should only accept special action jurisdiction of immunity claims if doing so serves judicial economy by resolving the immunity issues as to all claims in the case. *See Yarnell,* 184 Ariz. at 315, 909 P.2d at 382. Both sides, however, have spent the bulk of their time and effort on the contract claim and both concede that it is the primary issue being contested here. As a result, this decision fulfills the goals of *Yarnell.*